Cite as 2024 Ark. App. 3

# ARKANSAS COURT OF APPEALS
## DIVISION I
#### No. CV-22-466

| | |
|---|---|
| FREDDIE BRADSHAW | Opinion Delivered January 10, 2024 |
| APPELLANT | |
| | APPEAL FROM THE DALLAS COUNTY CIRCUIT COURT [NO. 20DR-21-27] |
| V. | |
| IRENE BRADSHAW | HONORABLE MARY THOMASON, JUDGE |
| APPELLEE | |
| | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

This is an appeal of a domestic-relations case involving Freddie Bradshaw ("Freddie")

and Irene Bradshaw ("Irene"). Freddie appeals both the divorce decree and the order

denying his motion for a new trial entered by the Dallas County Circuit Court. Freddie

argues that the circuit court's division of property was clearly erroneous and asks this court

to reverse certain provisions of the decree to correct these errors of law. Having considered

the merits of this appeal, we affirm.

## I. *Background Facts*

Freddie and Irene were married on November 4, 1991, and lived together as husband

and wife until July 3, 2017. On May 13, 2021, Irene filed a complaint for divorce, and

Freddie filed a counterclaim for divorce on the same day. At the time of the divorce, the

only issue in dispute was the division of property. A temporary agreed order was entered on

July 28 that gave Irene the rights to and responsibility for managing and operating Arkansas Gravel Co., Inc., and gave Freddie the rights to and responsibility for managing and operating Home Services of Camden, Inc. ("Home Services"). Additionally, after the parties' separation, they agreed to divide or sell various property of the marital estate and split the proceeds between them.

A final divorce hearing was held on August 30 and 31, 2021, and counsel for Irene announced to the court that the parties had settled some of the property distributions and read those into the record. Additionally, Irene requested a trial to present evidence of various items and marital property that she contended had been sold by Freddie. Testimony was presented regarding the contested debt responsibilities and property division.

Nicole Zack—Freddie's girlfriend—was subpoenaed to appear at the final divorce hearing to produce and permit inspection of certain documentation, including but not limited to, "all records of any type for all real properties purchased by you, the defendant, or jointly by both of your for the time period July 3, 2017, to August 3, 2021, including, but not limited to: deeds, closing statement, mortgages and sources of funds for property purchased." On August 30, Ms. Zack appeared at the hearing but failed to provide the requested documents. The next day she appeared in court and provided documentation for five properties she had purchased during the relevant time frame stated in the subpoena.

After the divorce hearing, however, Irene filed a motion for contempt, alleging that since the final hearing, she discovered Ms. Zack had contracted to purchase approximately seventy-seven acres in Calhoun County, Arkansas—prior to the final divorce hearing—but

2

failed to advise the court of the purchase. As a result, the circuit court held a subsequent hearing on the contempt motion on October 5. Freddie testified that he had given Ms. Zack $29,000 as the initial payment for the Calhoun property from the proceeds he had received from the sale of the parties' marital residence and that both he and Irene had received approximately $150,000.

On November 4, the circuit court entered the decree of divorce. The decree found the stipulations of the parties to be as follows:

a. [Irene] will own all interest in Arkansas Gravel Co., Inc.;

b. [Freddie] will own all interest in Home Services of Camden, Inc.;

c. [Irene] will pay to [Freddie] the sum of $1.1 million, which represents the difference in the values of the two corporations;

d. The parties agreed they would both refinance their corporate debt within (10) months from the date of the Decree and hold the other party harmless. If a corporate debt is not paid then that property would be sold to satisfy the debt. The party receiving the corporation would receive all proceeds except for payments made by the other party to protect his or her credit.

e. Quality Auto Sales of Hampton, Inc., will be divided 50/50 between the parties. The only asset remaining in Quality Auto is its receivables. The parties shall collect the receivables and divide equally.

f. If the parties cannot agree on a distribution of their real estate holdings, then the properties will be listed for sale with a real estate agent in a commercial and reasonable manner. The parties agreed that the Court would appoint a qualified person to perform a market analysis of the properties. Hodnett Realty Company was appointed by the Court to determine the values of the real estate. The parties were given until November 5, 2021, to divide the real estate. Any property not divided by November 5, 2021, will be listed with Hodnett Realty Company for sale.

g. The market value analysis of the real property by Hodnett Realty Company resulted in a bill of $8,225.00. The parties shall each pay one-half of that amount to Hodnett Realty Company within thirty (30) days of the Court's Letter Opinion, dated October 21, 2021.

The decree further ordered that the parties had thirty days to divide all personal property, and in the event the parties were unable to reach an agreement, the circuit court would appoint an auctioneer to auction the personal property. The remainder of the decree set forth the division of the parties' debt responsibilities and property.

On November 18, Freddie filed a motion for a new trial, taking issue with certain findings in the decree—discussed in detail below—and requested that the circuit court reconsider the alleged errors; amend its findings of fact and conclusions of law; and enter a corrected judgment. The circuit court denied Freddie's motion for new trial on December 15, and Freddie timely appealed. This appeal followed.

II. *Standard of Review*

Domestic-relations cases are tried de novo on appeal, and the appellate court does not reverse a circuit court's finding unless they are clearly erroneous. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Norman v. Norman*, 342 Ark. 493, 30 S.W.3d 83 (2000).

Furthermore, a circuit court has broad powers to distribute property in order to achieve an equitable distribution. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219

4

(2001). The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Id.* With respect to the division of property in a divorce case, we review the circuit court's findings of fact and affirm them unless they are clearly erroneous or against the preponderance of the evidence. *Thomas v. Thomas*, 68 Ark. App. 196, 4 S.W.3d 517 (1999). In reviewing a circuit court's findings, we defer to the court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Keathley, supra.* This court acknowledges that the statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Baxley v. Baxley*, 86 Ark. App. 200, 167 S.W.3d 158 (2004).

### III. *Issues on Appeal*

On appeal, Freddie argues the following: (1) the circuit court erred in making mathematical errors in the decree; (2) the circuit court erred when it ordered Freddie to pay Irene one-half of the purchase price for the "Zack Properties"; (3) the circuit court abused its discretion in its division of personal property—overriding the parties' stipulation that was incorporated into the decree; and (4) the circuit court erred in ordering Freddie to pay Irene $56,250 for reimbursement of wages paid to Ms. Zack.

### IV. *Discussion*

#### A. Mathematical Errors in the Decree of Divorce

For his first point on appeal, Freddie maintains that the circuit court's findings regarding the difference in distributions of Home Services—and the resulting sums he was

5

ordered to pay Irene—were the result of clear mathematical errors that must be corrected on appeal. In response, Irene argues that the order of the court results in her receiving the exact amount of distributions from Home Services as Freddie; thus, the order should be upheld.

1. *Home Services distributions from January to July 2021*

As stated above, during the pendency of the divorce, the parties agreed that Freddie would have the rights to and responsibilities for managing and operating Home Services, and Irene would do the same for Arkansas Gravel Co., Inc. The temporary order held that neither Freddie nor Irene were to take any owner distributions from either corporation during the pendency of the order. Furthermore, it was stipulated in the divorce decree that Irene would pay Freddie $1.1 million, which represented the difference between the values of the two corporations. Counsel for Irene advised the circuit court that she would present evidence of marital funds that had already been spent by Freddie and requested that those expenditures by Freddie offset the $1.1 million she agreed to pay Freddie to account for the difference in corporation values. In response, Freddie argued that the $1.1 million was already stipulated to; thus, if there was evidence presented that he owed some amount of money to Irene, it should not be in the form of an offset but, rather, an amount of money he owed to Irene. Irene agreed.

Paragraph 9 of the divorce decree states as follows:

> [Freddie] shall pay to [Irene] the sum of $124,690.00. [Freddie] received the sum of $124,690.00 more in distributions from [Home Services] than [Irene] during the period of January 2021 to July 31, 2021.

6

In support of the court's ruling, the court cited exhibit 28, which consisted of copies of nine checks from Home Services payable to Freddie and three cash withdrawal slips totaling $124,690. Freddie contends that the circuit court committed a clear mathematical error by ordering him to pay Irene the full sum over and above his distributions, resulting in an unequal distribution by shifting the imbalance from one party to another. Accordingly, Freddie argues that the court should have ordered him to pay one-half of the $124,690 to Irene instead. We disagree.

When viewing the record and divorce decree as a whole, we cannot find that the circuit court's division of property was clearly erroneous. To the contrary, the circuit court diligently reviewed the evidence and testimony in order to reach a property distribution that was fair and equitable. Furthermore, the court derived its calculations by a thorough review of the evidence, including nine checks from Home Services written to Freddie as well as three pages of deposit and withdrawal slips from Arvest Bank. In conclusion, the circuit court found that Freddie had received $124,690 *more* than Irene during the relevant time period from Home Services; thus, in order to make Irene whole, Freddie was ordered to pay her the amount that he had received over and above what Irene received. Further, there was testimony presented by Irene that Freddie accepted checks payable to him individually that should have been payable to Home Services.

We simply are not left with a definite and firm conviction that a mistake was made; thus, the court's ruling was not arbitrary or groundless. The circuit court was precise and

detailed in its attempts to equitably divide the property in a complex case. We therefore affirm on this issue.

### 2. *Home Services distributions from January to December 2020*

Similarly, paragraph 10 of the decree states, "[Freddie] shall pay to [Irene] the sum of $46,854.10 for the difference in distributions from [Home Services] during the period of January 1, 2020 to December 31, 2020." Accordingly, Freddie argues that the circuit court committed a second mathematical error.

The circuit court relied on Irene's exhibit 6 in making its finding. Exhibit 6 is a four-page general 2020 ledger of Home Services. The circuit court used this document to calculate all the deposits and withdrawals from Home Services for both Freddie and Irene for the 2020 calendar year and determined that Freddie had received $46,854.10 more from the corporation than Irene. This did not amount to shifting the imbalance to Freddie but, rather, made the distributions equal between the parties. If the court had ordered Freddie to pay one-half of the $46,854.10, as he suggests, he would still be receiving $23,427.05 more than Irene, leading to an unequal distribution. Accordingly, for the same reasons as set forth in the preceding section, we affirm. The circuit court's ruling was not groundless.

### B. Zack Properties

Ms. Zack purchased five parcels of real property—prior to the final divorce hearing—that she claimed were either purchased with funds she saved from her previous employment or with funds given to her by Freddie from the funds Freddie and Irene split by agreement from the sale of marital property.

Regarding these properties, paragraphs 18 and 19 of the divorce decree state as follows:

> Properties purchased by Nicole Zack, specifically, 116 Nichols Street, 120 Nichols Street 151 Continental Drive, and Hickory Hill Drive were purchased with marital funds from [Freddie]. It was obvious throughout Ms. Zack's testimony that she was not being honest with the Court. Ms. Zack's testimony that she used cash she had saved was not credible. [Freddie] shall pay to [Irene] one-half of the purchase price of the properties.

> [Freddie] shall pay to [Irene] the sum of $14,500.00, representing 1/2 of the payments that had been made on the Calhoun County, Arkansas property as of August 30, 2021.

### 1. *Purchase price vs. funds paid*

First, Freddie argues that the circuit court clearly erred in ordering one-half of the total purchase price to be paid to Irene as opposed to one-half of the amounts paid toward the purchase of those properties as of the date of the divorce hearing. This argument lacks merit because there was no difference between the purchase price and the funds paid on the majority of the properties; thus, as to those properties, Freddie's argument is irrelevant. With regard to the Hickory Hill property, Freddie claims that of the $95,000 purchase price, only $25,000 was paid; therefore, Irene was entitled to only half of the funds paid, or $12,500, not half of the full purchase price.

In response, Irene argues that Freddie's argument ignores the fact that nearly ten months had passed from the time the Hickory Hill property was purchased until the final divorce hearing. Accordingly, she contends the circuit court did not err in taking into account the monthly payments of $7,000 made with marital funds in addition to the $25,000

9

down payment. We agree. Ms. Zack testified that she entered into an installment contract on the property with a monthly payment of $7,000. She also testified that the balance on the Hickory Hill property was $20,000; however, Ms. Zack provided no documentation evidencing a balance due on the property.

While the circuit court did not provide an explanation as to why it ordered Freddie to pay Irene one-half of the total purchase price of Hickory Hill, it held that all four properties "were purchased with marital funds from [Freddie]." Given that Ms. Zack admitted she had been paying $7,000 a month on the property for ten months and presented no evidence that a balance remained on the property—other than her own testimony, which the court found lacking in credibility—we do not find that the court committed clear error by ordering Freddie to pay Irene one-half of the purchase price of all four properties. The down payment of $25,000 plus roughly $70,000 in monthly payments over the course of ten months amounts to the full purchase price of the Hickory Hill property.

2. *Calhoun County property*

After the final divorce hearing, Irene discovered another property that Ms. Zack had previously purchased in her name but that she did not disclose at the hearing ("the Calhoun property"). As a result, Irene filed a contempt action on September 28, 2021, and the circuit court held a hearing on the motion on October 5. At the hearing, both Freddie and Ms. Zack testified that the funds used to purchase the Calhoun property had come from Freddie. Freddie asserted that the money he used as the initial down payment on the property had come from the proceeds he obtained from the agreed upon sale of the marital residence;

thus, these funds were nonmarital property. The circuit court held that Freddie was responsible for paying Irene the sum of $14,5000, representing one-half of the payment made on the property.

On appeal, Freddie argues that it was improper and erroneous for the circuit court to order one-half of this amount to be paid to Irene because he and Ms. Zack both testified at the contempt hearing that the property was purchased using nonmarital funds. In response, Irene highlights the fact that Ms. Zack had two opportunities—while on the witness stand and under a subpoena—to disclose all real estate that had been purchased in her name during a certain time frame; however, neither Freddie nor Ms. Zack made any mention of the Calhoun property. Further, she points to the inconsistent statements made by both Freddie and Ms. Zack on multiple occasions regarding what account was used to fund the purchase the various properties; and Ms. Zack's testimony at the final divorce hearing that Freddie never provided her with the funds to purchase real estate, a statement in direct contradiction to her testimony at the contempt hearing.

As detailed above, the circuit court found Ms. Zack's testimony to be lacking in credibility, holding that "it was obvious throughout [her] testimony that she was not being honest with the Court." Considering the court's credibility finding—coupled with Freddie's and Ms. Zack's differing responses at the final divorce hearing on who paid for the properties purchased in Ms. Zack's name and Ms. Zack's clear unwillingness to disclose the purchase of the Calhoun property without being forced to do so—we find that the court's ruling was not clearly erroneous.

## C. Personal Property

Freddie argues that the parties' stipulation regarding division of personal property—and paragraph 6 of the divorce decree, which states that if the parties are unable to reach an agreement, the personal property would be sold—conflicts with paragraph 14 of the decree; therefore, the circuit court erred in its division of the parties' personal property.

Paragraph 14 states, in part, as follows: "[Irene] will receive as her sole and separate property the jewelry in her possession. [Freddie] shall pay to [Irene] the sum of $85,000 for her one-half of the value in the jewelry, silver, and coins." In making this finding the court held as follows:

> [Freddie]'s last personal financial statement was March, 2021 in which he identified a value for guns, jewelry, coins and silver of $350,000.00. [Irene] testified that her jewelry was worth $90,000.00. [Freddie], in his deposition, stated he had $25,000.00 to $30,000.00 in silver eagles and a few gold coins. The parties both testified the guns had minimal value. [Freddie] offered no proof as to how much he had in guns, coins and silver, and there is no way for the Court to adequately assess the value of the items other than [Freddie]'s financial statement in which he indicated the value to be $350,000.00 or $175,000.00 each.

Freddie contends that because the parties announced an agreement at the final divorce hearing regarding the distribution of personal property that did not exempt guns, jewelry, coins, or silver, the circuit court "impermissibly deprived the parties of their benefit of the bargain under the agreement." Furthermore, Freddie argues that in reliance on this agreement, he did not focus his testimony or evidence on the value of the guns, jewelry, coins, or silver nor did he attempt to refute Irene's testimony regarding personal property in her possession or whether any of such property was nonmarital.

This argument lacks merit because it entirely ignores the fact that the two-day trial was held at Irene's request to account for the marital money and assets that Irene alleged were hidden and sold by Freddie and Ms. Zack. Further, paragraphs 6 and 14 are not in conflict because paragraph 6 accounts for the personal property still in the parties' possession, and paragraph 14 was included by the court to make Irene whole as a result of personal property Freddie sold prior to the final divorce hearing.

In the circuit court's opinion letter, it specified certain findings related to the parties' "guns, jewelry, coins, and silver." In his deposition, Freddie stated that he had $25,000 to $30,000 in silver eagles and a few gold coins in his possession. At trial, Freddie testified that Irene had three pieces of jewelry valued at $38,000, $25,000, and $15,000, which was in line with Irene's testimony that she had approximately $90,000 in jewelry in her possession. However, as noted by the circuit court, Freddie's last personal financial statement in March 2021 identified a value of $350,000 in jewelry, coins, and silver. As noted in Irene's brief, the guns, jewelry, coins, and silver had been listed on the parties' personal financial statements since at least 2010; and from 2010 to 2021, they had increased in value from $165,000 to $350,000. Because Freddie did not present any evidence regarding the value of the items at the final hearing, the court used the value of these items as reflected in the 2021 financial statements and held that Irene was entitled to $85,000 for her one-half of the value of the items Freddie had in his possession minus the $90,000 in jewelry already in Irene's possession.

The court did not abuse its discretion in making this finding.  In fact, our review reveals that the court went to great lengths to reach an equitable distribution.  Freddie testified that most of the personal-property items in question are now gone, and while he testified at the hearing that he sold most of the silver and coins in 2018, he could not recall the buyer or the approximate amount he received from the sale.  He also acknowledged that the value of these items continued to be reflected as $350,000 on his personal financial statements after 2019.  The circuit court clearly accorded great weight to Freddie's personal financial statement identifying $350,000 in guns, jewelry, coins, and silver, and because the circuit court is in the superior position to make this decision, we affirm.

### D.  Reimbursement of Wages to Ms. Zack

The divorce decree ordered Freddie to pay Irene $56,250 as reimbursement for one-half of the $112,500 that Ms. Zack was paid by Home Services from March 18, 2020, to August 29, 2021.  The court found that Freddie began paying his mistress a weekly salary for her employment at Home Services on March 18, 2020.  Testimony established that Ms. Zack's compensation began less than two weeks after Irene received her final check from the corporation.  Ms. Zack described her duties at Home Services as speaking with potential leads, organizing employee schedules and work schedules, making bank runs, handling shipments and insurance, and scheduling inspections.

The court acknowledged Ms. Zack's testimony that before she was employed at Home Services, she managed a strip club in Hot Springs.  On the basis of the testimony presented, the court found that Ms. Zack's qualifications for the job she allegedly performed at Home

14

Services were questionable and noted that Ms. Zack testified she did not know about coding. Thus, the circuit court held that Freddie was diverting money into his household, which Ms. Zach and her daughter shared; therefore, Irene was entitled to one-half of the money Freddie paid to Ms. Zack for her weekly salary from Home Services.

Freddie argues on appeal that the circuit court's finding was based on an erroneous interpretation of Ms. Zack's testimony; accordingly, the ruling as to reimbursement of Ms. Zack's salary should be reversed and remanded with instructions to the circuit court to make a determination as to the reasonableness of the work performed in order to offset this sum. Freddie, however, is asking this court to reweigh the evidence and credibility determinations of the circuit court, which we cannot do. The circuit court found "it was obvious" throughout Ms. Zack's testimony that she was not being honest with the court. As we defer to the circuit court's superior position to determine the credibility of witnesses and weight accorded to their testimony, we hold that the circuit court's finding was not clearly erroneous. Testimony established that, despite having no prior experience in the field, the weekly checks to Ms. Zack amounted to more than the weekly checks ever made to Irene or Freddie. That, coupled with the fact that Ms. Zack's duties and number of hours worked were not supported by anything other than her testimony—which the court found to lack credibility in its entirety—does not leave this court with a definite and firm conviction that a mistake has been committed.

V. *Conclusion*

15

Considering the evidence and being mindful of our standard of review, we find that the circuit court's ruling is not clearly erroneous; accordingly, we affirm.

Affirmed.

HARRISON, C.J., and HIXSON, J., agree.

*The Applegate Firm, PLLC*, by: *Ryan J. Applegate*, for appellant.

*Nutt Law Firm, PLLC*, by: *Tiffany Parker Nutt*, for appellee.